**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LYNNE EBERHARDT,

                Plaintiff,

                                      Case Number: 05-71518

v.

FIRST CENTRUM, LLC, and CENTRUM         JUDGE PAUL D. BORMAN
MANAGEMENT, LLC,                         UNITED STATES DISTRICT COURT

                Defendants.

_____ /

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY**
**JUDGMENT (DOCK. NO. 21)**

       Now before the Court is Defendants' Motion for Summary Judgment.  The Court held a

motion hearing on January 10, 2007.  Having considered the entire record, and for the reasons

that follow, the Court GRANTS Defendants' Motion for Summary Judgment.

**I.**       **FACTS**

       This case revolves around Plaintiff Lynne Eberhardt's ("Plaintiff") termination from

Centrum Management, L.L.C. ("Centrum").   Centrum is a Virginia limited liability company

which manages several rental properties in Michigan.  (Am. Compl. ¶ 4).  Centrum is a wholly-

owned affiliate of First Centrum, L.L.C. ("First Centrum"), also a Virginia limited liability

company, which develops rental properties in numerous states.  (Defs.' Br. 1).  First Centrum's

President and Chief Executive Office is Mark Weshinskey ("Weshinskey").  (*Id*.).  Weshinskey's

religious affiliation is Methodist.  (*Id*.).  Rob Couch ("Couch") is the President of Centrum,

reports directly to Weshinskey, and is a member of the Church of Latter Day Saints ("LDS").

(*Id*.).

Centrum's Regional Directors report directly to Couch and are assigned to oversee properties in different geographical regions. (*Id*.). The Regional Directors work to maximize capacity and revenue for the properties in their regions. (*Id*.).

Plaintiff, a Michigan resident, was hired on July 1, 2002 as the Regional Director of Centrum's Michigan portfolio. (Am. Compl. ¶¶ 1, 7, 8). Plaintiff supervised six Michigan rental communities, supervised all the staff that were employed at these properties, and reported directly to Couch. (Pl.'s Resp. 1). Plaintiff was responsible for 792 total units. (Defs.' Br. 2).

Plaintiff was one of five Regional Directors, with Rick Jones, Regional Manager of the Northern Virginia region, being the only male in the position. (*Id*.). Jones is a member of LDS. (Pl.'s Resp. 5). Regional Directors do not have a Centrum office and work out of their homes. (Defs.' Br. 2).

When Plaintiff started with Centrum, none of her properties were at 100 percent occupancy, which is a significant priority for a Regional Director. (*Id*. at 2, 3). Michigan was experiencing a weak economy, which negatively impacted rental properties. (Pl.'s Resp. 2). Plaintiff also experienced floods, roof cave-ins, and fires at five of her properties during her employ. (*Id*.). At the end of calendar year 2002, Couch recommended Plaintiff for a 2.5 percent annual raise, which was approved by Weshinskey. (Defs.' Br. 3-4).

In March 2003, Defendants held a national sales conference. (Defs.' Br. 4). Plaintiff attended the conference, during which time a video entitled "Johnny Lingo" was viewed. (Pl.'s Resp. 4). The 1969 vignette was produced by Brigham Young University for LDS. (Defs.' Br. 4). The video jacket dedicated that the it helped teach the importance of self esteem and consideration of others. (*Id*.). In the twenty-four minute video, a Polynesian man, Johnny

2

Lingo, negotiates a dowry of the woman he wants to marry. (*Id*.). Lingo gives his future father-in-law more cows that the father requests and expects. (*Id*.). Plaintiff testified that Lingo "saw value in the woman that the abusive father did not." (Pl.'s Resp. Ex. 2, Pl.'s Dep. 22-23). The video did not contain a religious ceremony, nor was it clear to Plaintiff that any of the characters were religious leaders. (*Id*. at 23). Plaintiff admitted that the dowery practice is still used in some cultures today. (*Id*. at 25). The video was shown only once. (Defs.' Br. 4).

Couch explained that the film was shown to support the concept that people should treat others with respect and to help people reach their full potential. (*Id*.). However, Plaintiff, and others, found the video offensive to women and inappropriate in a business setting. (Pl.'s Resp. 7). Plaintiff felt the video compared a woman's value "to the numbers of cows she can be sold or married off for." (Pl.'s Resp. Ex. 2, Pl.'s Dep. 23-24). One of Plaintiff's employees, Jill Matlock, was offended by the video. (Pl.'s Resp. 6). Matlock "found the film offensive because of the way it portrayed women as possessions and equated women's [sic] value to how many cows they were worth." Likewise, Janet Smith, Vice President of Sales and Marketing, told Plaintiff that Couch's comments were offensive, inappropriate, discriminatory, and was astounded that the film was shown. Smith denies that the video was offensive. (Pl.'s Resp. 7). In addition to Matlock and Smith, Kelly Tobin-Smith and Judy Camillo told Plaintiff they were offended by the film. (*Id*.).

According to Plaintiff, after the film, Couch continued the woman/cows theme by telling female employees how many cows they were worth. (*Id*.). Couch referenced a female employee who was breast feeding as the "resident cow, late because she was producing milk." (Pl.'s Resp. Ex. 12, Matlock Aff. ¶ 7(f)). Couch also made gender-specific comments about women. (*See*

Pl.'s Resp. Ex. 12, Matlock Aff.). Those comments included that some of the women felt warm and some felt cold because of their hormones. (Pl.'s Resp. 6)

Couch also shortened bathroom breaks during the 2003 sales meeting, which is alleged to disparately impact the large number of female employees, as compared to the relatively few male employees. (Pl.'s Resp. 5). Also at the annual meeting, shirts were given out by Defendant to their employees. (*Id*.). The men's and women's shirts were different colors, with the men's shirts forest green and the women's shirts olive green. (Def.'s Br. Ex. T, Pl.'s Dep. 210). The women's shirt color was chosen by Janet Smith, First Centrum's Vice President of Marketing and Sales. (Pl.'s Rep. 2, 5). Smith testified that she picked out the color for the women's shirts. (*Id*. at 5). When Plaintiff asked if she could have the same color shirt as the men, Couch informed her that she could not. (*Id*.).

On the last night of the March 2003 sales conference, all of Defendants' employees attended a dinner cruise on the Potomac River. (Defs.' Br. 5). At the time of the dinner, the United States-led invasion of Iraq was imminent and Couch said a prayer, to all those having dinner, on behalf of the United States troops. (*Id*.). Prayers were said by Couch before other group meals as well. (Pl.'s Resp. Ex. 6, Smith Dep. 41).

After the national sales meeting, Plaintiff complained to Couch about the Johnny Lingo film, his sexist comments, and the mandatory prayers. (Pl.'s Resp. 9)[1]. Plaintiff and Regional Directors Yvonne Hart and Michelle Custer informed Couch that his conduct was inappropriate and offensive. (*Id*.). Couch responded by slamming his fist on the table. (*Id*.). Both Hart and

---

[1] Plaintiff testified that Hart, Custer and herself informed Couch that his actions were inappropriate and offensive in November of 2002, which was before the March 2003 national sales conference. (Pl.'s Resp. Ex. 2, Pl's Dep. 32-33).

4

Custer remained employed with Defendants after Plaintiff's eventual termination.  (Pl.'s Resp. Ex. 2, Pl.'s Dep. 135-36).

On April 1, 2003, Couch sent an email to Plaintiff stating that it had been six to eight months since Plaintiff took over and the overall occupancy for Plaintiff's property portfolio is flat.  (Pl.'s Resp. Ex. 7, Couch E-mail 4/1/03).  Couch opined that while "Courthouse [Square] looks better than ever, Anchor Bay taxed out, [and] Auburn Hill [was] refinanced," the occupancy has not improved and that is what makes the company money.  (*Id.*).

Plaintiff continued to complain to Couch over the telephone on a regular basis.[2]  (Pl.'s Resp. 10).  In October of 2003, Defendants held another sales conference, which was attended by Weshinskey.  (Defs.' Br. 6).  Plaintiff did not complain to Weshinskey about the allegedly ongoing discrimination she was experiencing.  (*Id.*).

Because of the low occupancy levels of Defendants' Michigan properties, a meeting was scheduled for January 8, 2004 at First Centrum's corporate headquarters.  (*Id.*).  Couch did not attend the meeting.  (*Id.*).  The purpose of the "summit meeting" was to share ideas in order to increase occupancy at all Michigan properties.  Plaintiff and Smith attended for Centrum.  (*Id.*).  Plaintiff claims that during the meeting Bob Saloman, a developer for First Centrum, stated that she was stupid and incompetent.  (Pl.'s Resp. 11).  Weshinskey felt that Plaintiff was dismissive of his comments and the suggestions of others.  (Defs.' Br. 6).  Plaintiff admits that she dismissed a few of Weshinskey's suggestions, but no one informed her that they had a problem with her conduct.  (*Id.*).  Smith described Plaintiff's attitude as getting confrontational and hostile.  (Defs.' Br. Ex. U, Smith Dep. 34).

---

[2] Plaintiff does not give specifics on her continual complaints to Couch.

5

In January 2004, Plaintiff's salary was at $80,500, while Jones's salary was at $102,000. (Pl.'s Resp. 5).

Sometime after the January 8, 2004 meeting, Weshinskey order Couch to terminate Plaintiff.  (Defs.' Br. 7).  Weshinskey had suggested to Couch on prior occasions, in 2003, to fire Plaintiff, but had never demanded it.  (*Id*.).  Couch then began searching for Plaintiff's replacement and eventually contacted Stephanie Zitterkopf, a former subordinate.  (Defs.' Br. 7).  Zitterkopf accepted the position and Couch fired Plaintiff on February 18, 2004, stating that Courthouse Square had not performed.  (Pl.'s Resp. 11).

Plaintiff filed a three-count Complaint on March 8, 2005 in Oakland County Circuit Court.  Plaintiff alleged gender discrimination, religious discrimination and retaliation based upon religious preference.  Defendants removed the case to this Court on April 19, 2005. Plaintiff field an Amended Complaint on September 28, 2005.  Defendants' Motion for Summary Judgment was filed on September 18, 2006.  Plaintiff filed her Response on October 16, 2006.  Defendants filed their Reply on October 25, 2006.

## II.     ANALYSIS

### A.     Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof."  FED. R. CIV. P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex*

6

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.

7

FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "'[C]onclusory' allegations unsupported by 'specific' evidence will be insufficient to establish a genuine issue of fact." *Id.* (citations omitted). *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 902 (1990).

"[T]he showing (whether as to standing or the merits) required to overcome a motion for summary judgment is more extensive than that required in the context of a motion to dismiss." *Id.* "The principal difference is that in the former context evidence is required, while in the latter setting the litigant may rest upon the allegations of his complaint." *Id.* (citations omitted); *see* FED. R. CIV. P. 56(e) (requiring the "nonmoving party to go beyond the pleadings.").

**B.    Discussion**

**1.    Gender and Religious Discrimination**

a.    Gender Discrimination

In analyzing claims of unlawful discrimination under the ELCRA based upon indirect evidence, the Court must apply the following three-step *McDonnell-Douglas* framework. *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462-63 (2001) (relying upon Title VII jurisprudence in adjudicating state anti-discrimination claims). First, the plaintiff must establish a *prima facie* case of unlawful discrimination. *Clayton v. Meijer, Inc.,* 281 F.3d 605, 610-11 (6th Cir. 2002). Once the plaintiff establishes a *prima facie* case of unlawful discrimination, a presumption of such unlawful discrimination arises, and the burden of production shifts to the defendant to

articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254-55 (1981). If the defendant meets this burden, then the presumption of unlawful discrimination disappears, and the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for unlawful discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action. *See Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994). If the plaintiff demonstrates that the defendant's proffered, legitimate reason is a pretext for unlawful discrimination, then the fact finder may infer unlawful discrimination. *See Kline v. Tenn. Valley Auth.,* 128 F.3d 337, 344 (6th Cir. 1998). Throughout the entire *McDonnell-Douglas* framework, the plaintiff bears the burden of persuasion. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511 (1993). The shifting burdens of proof described in *McDonnell-Douglas* are not applicable if a plaintiff can cite direct evidence of unlawful discrimination. *Trans World Airlines, Inc v. Thurston*, 469 U.S. 111, 121 (1985).

The pertinent part of the ELCRA provides:

> (1) An employer shall not do any of the following: (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of religion, race, color, national origin, age, sex, height, weight, or marital status.

M.C.L. § 37.2202(1)(a).

"Although federal precedence interpreting the federal Civil Rights Act is not binding on Michigan courts interpreting our own civil rights statutes, federal precedence can be used as a guide by Michigan courts. *Downey v. Charlevoix Co. Bd. of Road Comm'ns.*, 227 Mich. App.

621, 627 n.3 (1998) (citing *Radtke v. Everett*, 442 Mich. 368, 382 (1993).

Under Michigan law, discrimination based on sex includes sexual harassment. M.C.L. §

37.2103(i).  The Michigan statute defines sexual harassment as follows:

> Sexual harassment means unwelcome sexual advances, requests for sexual favors,
> and other verbal or physical conduct or communication of a sexual nature under the
> following conditions:
>
> (i)      Submission to the conduct or communication is made a term or condition
>          either explicitly or implicitly to obtain employment, public accommodations
>          or public services, education, or housing.
> (ii)     Submission to or rejection of the conduct or communication by an individual
>          is used as a factor in decisions affecting the individual's employment, public
>          accommodations or public services, education, or housing.
> (iii)    The conduct or communication has the purpose or effect of substantially
>          interfering with an individual's employment, public accommodations or
>          public services, education, or housing, or creating an intimidating, hostile, or
>          offensive employment, public accommodations, public services, educational,
>          or housing environment.

M.C.L. § 37.2103(i).

In the instant case, it is uncontested that Plaintiff does not have direct evidence of

discrimination.  Plaintiff solely relies on circumstantial evidence.

In order to establish a prima facie case of disparate treatment for sex discrimination under

the *McDonnell-Douglas* framework, a plaintiff must prove that: (1) she was a member of the

protected class; (3) she suffered an adverse employment action; (3) she was qualified for the

position; and (4) she was (a) replaced by someone outside the protected class, or (b) treated less

favorably than similarly-situated persons outside the class.  *Mitchell v. Toledo Hosp.*, 964 F.2d

577, 582, 582 n.4 (6th Cir. 1992).

            i.       *Adverse Employment Action*

As there is no disagreement between the parties regarding the first element of Plaintiff's

10

prima facie case, Defendants argue that Plaintiff has failed to prove that some of the alleged

conduct constituted adverse employment action.  An adverse employment action requires the

plaintiff to show that the employment action that was materially adverse.  *Wilcoxon v. 3M*, 235

Mich. App. 347, 363 (1999) (citation omitted).  Examples of adverse employment actions

include "termination of employment, a demotion evidenced by a decrease in wage or salary, a

less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices that might be unique to a particular situation."  *Id.*  (quoting

*Crady v. Liberty Nat'l. Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

Defendant argues that four of Plaintiff's allegations of gender discrimination in her

Amended Complaint do not rise to the level of adverse employment actions.  Defendants list (1)

classifying male and female employees on the basis of the female employee' sex adversely

affecting the status of Plaintiff on the basis of sex (Am. Compl. ¶ 14(e))[3]; (2) that she was

deprived of information vital to her performance (Am. Compl. ¶ 14(c)); (3) condoning unethical

and illegal practices of male employees (Am. Compl. ¶ 14(k)); and (4) that she was denied

COBRA benefits equal to a man (Am. Compl. ¶ 14(n)).

Plaintiff does not provide evidence that any of the above actions were materially adverse,

nor does she respond to Defendants' arguments.  Under Plaintiff's claim that Defendants treated

male and female employees different, her assertion that women and men were given different

color shirts as gifts is not persuasive because the color of the women's shirt was chosen by

Smith, a female, and not by a male employee of Defendants.  Additionally, the fact that the

---

[3] E.g., (a) that "she could never be a good old boy;" (b) different color shirts given to male
and female managers as gifts at a staff meeting; and (c) the shortening of restroom breaks at the
national meeting from fifteen minutes to ten minutes.

11

shorter restroom breaks, which were applied to men and women, does not fall along the lines of "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  Likewise, Couch's comment, which Plaintiff interpreted to be that she could never be a good old boy, while possibly inappropriate, is ambiguous at best.  It is not a materially adverse employment action because it is unrelated to the terms and conditions of employment

Further, while the loss of  COBRA benefits could be considered a material loss of benefits, Plaintiff testified that she did not believe she was denied COBRA benefits because she was female, but viewed it as retaliatory.  (Defs.' Br. Ex. T, Pl.'s Dep. 192).  Therefore, it is insufficient to support a prima facie case of gender discrimination.  In addition, Plaintiff's COBRA benefits were retroactively applied when the error was uncovered.  (*Id*. at 195).  The reason given to Plaintiff for the error was that the female employee who was in charge of COBRA did not realize there was a change in the law.  (*Id*. at 192).  The letter sent from Kristen Szebalskie to Plaintiff states, in part:

> First, I would like to sincerely apologize.  In 1999 the COBRA law changed and the company was not aware of it.  When I started with First Centrum in 2000, I continued to administer COBRA the way that it was currently being done with also no knowledge of the law change.  Prior to 1999, COBRA only had to be offered for medical insurance, not for dental or vision plans.  However that did change and we should have offered you both Dental and Vision coverage through COBRA.

(Defs.' Br. Ex. N, Szebalskie letter).

The unethical and illegal conduct by male employees, which was allegedly condoned by Defendants, is identified by Plaintiff as kickbacks from contractors and inaccurate tax credit information.  (See Defs.' Br. 10-11).  Plaintiff does not respond to this argument.  The Court

12

does not find that these actions have any relevance to gender discrimination against Plaintiff.

Instead of addressing Defendants' argument, Plaintiff responds that she was subjected to hostile environment on the basis of her sex and essentially argues that the hostile work environment was an adverse employment action. However:

> in the context of a discrimination claim, an adverse employment action (1) must be materially adverse in that it is more than "mere inconvenience or an alteration of job responsibilities," and (2) must have an objective basis for demonstrating that the change is adverse, rather than the mere subjective impressions of the plaintiff. *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich. App. 347, 365; 597 N.W.2d 250 (1999). While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. *Lytle v. Malady*, 458 Mich. 153, 173 (1998).
> . . . .
> Disparate treatment and hostile work environment are two separate claims.

*Lockett v. United Metal Products Corp*., Case Nos. 240889, 240890, 2004 WL 134011, *6-*7 (Mich. App. Jan. 27, 2004) (unpublished). This Court agrees. A hostile work environment, even one based upon sex, cannot be considered an adverse employment action. It is a separate and distinct cause of action and cannot be used to buttress Plaintiff's gender discrimination prima facie case.

Accordingly, the Court holds that Plaintiff's claims in ¶ 14(c), (e), (k), and (n) of Plaintiff's Amended Complaint are not adverse employment actions and thus cannot support Plaintiff's prima facie case of gender discrimination. Defendant does not challenge Plaintiff's gender discrimination claims in ¶ 14(d), (g), (l), and (m) of the Amended Complaint as adverse employment actions.

### ii.    *Qualified for the job*

Defendants argue that Plaintiff cannot establish that she was qualified for her job. Defendants point to the fact that: (1) Plaintiff was advised by Couch in March 2003, and

continuously after, that Plaintiff's occupancy levels needed to be higher; (2) Plaintiff testified

that her occupancy rate at Courthouse Square was not good, (Pl.'s Resp. Ex. 1, Pl's Dep. 186);

and (3) Southgate One's occupancy rate, at the time of Plaintiff's termination, had taken a

"dive." (Pl.'s Resp. Ex. 1, Pl's Dep. 187). Defendants contend that Plaintiff cannot produce

evidence that her performance met Defendants' legitimate expectations.

Plaintiff argues that her twenty years of supervisory experience in property management

makes her qualified for the position. Plaintiff cites Couch's testimony that Plaintiff was the best

candidate that he interviewed. (*See* Pl.'s Resp. Ex. 4, Couch Dep. 39).

At this stage, a court should focus on objective qualifications of the plaintiff when

determining whether or not she is qualified for the job. *Wexler v. White's Fine Furniture*, 317

F.3d 564, 575 (6th Cir. 2003).

> The prima facie burden of showing that a plaintiff is qualified can therefore be
> met by presenting credible evidence that his or her qualifications are at least
> equivalent to the minimum objective criteria required for employment in the
> relevant field. Although the specific qualifications will vary depending on the job
> in question, the inquiry should focus on criteria such as the plaintiff's education,
> experience in the relevant industry, and demonstrated possession of the required
> general skills.

*Id*.

In a light most favorable to the non-moving party, the Court finds that Plaintiff's vast

experience in property management over twenty plus years of employment in the field is

sufficient to show that she is minimally qualified for the position. Plaintiff disputes that she was

unqualified, and argues that her occupancy rates never fell below 84%. Further, Plaintiff states

that there were floods, roof cave-ins and fires at five of her properties during her employment

with Defendant. Plaintiff asserts that her Courthouse Square property alone had four fires and

14

required major renovations.  Accordingly, the Court holds that Plaintiff was qualified for her position.

<em>iii.    Treated less favorably than similarly-situated persons<br>outside the class</em>

Defendants contend that Plaintiff failed to show (1) that she was treated less favorably than male counterparts, (Am. Compl. ¶ 14(g)), and (2) that she was replaced by someone outside her class.  (Am. Compl. ¶ 14(m)).  Defendants initially point out that Plaintiff's claim that she was denied pay equal to that of male counterparts, identified Cusick, McPhee, and Jones as males who received higher pay.  Defendants argue that Plaintiff admitted in her deposition that McPhee and Cusick were not Regional Directors, thereby not comparable co-workers.  Defendants contend that while Jones was a Regional Director, he supervised one-third more properties and that was a legitimate justification for the pay differential.

Plaintiff does not dispute Defendants' contention that Cusick and McPhee were not similarly-situated co-workers.  Instead, Plaintiff directs her focus on Jones.  Plaintiff asserts that she was similarly-situated to Jones in all relevant aspects of her employment situation.  Plaintiff avers that they were subject to the same standards and review of their performance, performed the same job, were judged by the same person, and were reviewed in relation to the other Regional Directors.  Plaintiff also claims that she was treated less favorably than Jones for similar conduct.  Plaintiff argues that although Jones's occupancy rates were worse than her rates, he was granted a raise in December 2003 and not terminated for his poor performance.

"To create an inference of disparate treatment, [a plaintiff] must prove that [she was] similarly[-]situated, i.e., [that] 'all of the relevant aspects' of [her] employment situation were 'nearly identical' to those of [the compared employee's] employment situation."  *Mich. Dept. of*

15

*Civ. Rights ex rel. Burnside v. Fashion Bug*, 473 Mich. 863, 869 (2005) (citation omitted).

The Court finds that Plaintiff was similarly-situated to Jones in regards to the job position, her supervisor, her job duties, and the standards by which she was judged. However, Plaintiff's and Jones's positions were not the same in regards to the number of units each was assigned at the end of 2003. Plaintiff was assigned 792 units as of December 27, 2003, while Jones was assigned 1174 as of the same date. Additionally, Jones's units included two fairly new property developments which were 7.4% and 19.1% occupied. These developments dramatically decreased Jones's weekly occupancy rates. It does not appear that Plaintiff had any new developments to contend with. However, for purpose of the prima facie case, the Court holds that Plaintiff and Jones were similarly-situated.[4] Each performed the same job in different regions of the United States. The fact that they were assigned a different number of units is not determinative in the similarly-situated analysis. All of the relevant aspects of Plaintiff's position are nearly identical to Jones. Plaintiff is not required to be exactly identical to another employee, as that would be nearly impossible. Because the Court finds that Plaintiff is similarly-situated to Jones, and because, in a light most favorable to Plaintiff, she was terminated while a poorer performing Jones was not terminated, the Court holds that Plaintiff's claims in ¶ 14(d), (g) and (l) of her Amended Complaint satisfy the prima facie case of gender discrimination.

**b.     Religious Discrimination**

To establish a prima facie case of discrimination, a plaintiff must prove that: (1) she belongs to a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was (a) replaced by someone outside the protected class, or

---

[4] Plaintiff does not argue that she was replaced by someone outside her protected class.

16

(b) treated less favorably than similarly-situated persons outside the class. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582, 582 n.4 (6th Cir. 1992). To survive summary disposition, a plaintiff is required to raise a triable issue that religious discrimination was a motivating factor underlying the adverse employment action. *See Lytle*, 458 Mich. at 175-76.

In the instant case, Plaintiff is non-denominational, but still a member of the protected class. (Pl.'s Resp. Ex. 2, Pl.'s Dep. 199). Members of any religion, even agnostics and atheists who have no religious beliefs, are a protected class under the ELCRA. *Cline v. Auto Shop, Inc*, 241 Mich. App. 155, 157-58 (2000).

The adverse actions alleged by Plaintiff in her Amended Complaint are: (1) that she was required to watch the religious Johnny Lingo film; (2) that she and other employees were required to pray before meals and at other times; (3) that she and other employees were required to engage in group prayer prior to the invasion of Iraq and at other times; (4) that emails of a religious nature were sent to Plaintiff and other employees; and (5) that she was discharged because she did not share the same religious belief, i.e., Mormon, as Couch. (Am. Compl. ¶ 20(a) - (e)).

Defendants do not dispute that Plaintiff's termination was an adverse employment action. Defendants dispute that other incidents listed by Plaintiff in her Amended Complaint were adverse employment actions. Beginning with the Johnny Lingo film, Defendant argues that watching the film does not meet the definition of adverse employment action. Plaintiff, again, does not address the issue of the film as an adverse employment action, and instead points to her allegation that she was subjected to a hostile work environment on the basis of her religion as the adverse employment action.

17

As stated above, an adverse employment action requires Plaintiff to show that the employment action was materially adverse. *Wilcoxon*, 235 Mich. App. at 362.. Examples of adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id*. Additionally, as the Court previously mentioned, hostile work environment is a separate cause of action and can not be the basis for satisfying the adverse employment action prong of a discrimination prima facie case.

Turning the Court's attention to the video, requiring employees to watch one film, which was alleged to be religious only in the sense that it was produced by the Church of Latter Day Saints, does not fall along the lines of a termination, demotion, a less distinguished title, a loss of benefits, etc. Therefore, the Court finds that this incident is not a materially adverse employment action.

Next, Defendants argue that the three remaining claims – that Plaintiff was required to pray before one meal; pray once prior to the invasion of Iraq; and, that she was sent emails of a religious nature – are not adverse employment actions. Defendants first argue that Plaintiff's Interrogatories only identify praying before dinner and praying before the invasion of Iraq each happened one time. (See Defs.' Br. Ex. K, Pl.'s Ans. to Interrogatories 5-6). Defendants also argue that Plaintiff could only identify in her deposition one specific email from Couch which had religious content[5] and assert that Plaintiff fails to demonstrate how the above events were

_____

[5] Defendants cite Exhibit O of their brief as said email. However, Defendants mistakenly placed in Exhibit O a duplicate of Exhibit P. As a result, the Court is not able to view the alleged email.

18

adverse employment actions. Defendant argues that a prayer said before a meal, a prayer for U.S. troops on the eve of war, and an email, do not constitute material changes in the terms and conditions of employment. Further, Defendants proffer that Plaintiff admitted to forwarding a religious email to her property managers. (*See* Def.'s Br. Ex. P, Plaintiff's Email). Plaintiff does not respond.

Even in a light most favorable to the non-moving party, the prayers and the email cannot be considered adverse employment actions. The Court does not find that these incidents materially changed the terms and conditions of employment, nor has Plaintiff proffered a reason for the Court to view it as such. Accordingly, the Court finds that these incidents are not adverse employment actions.

However, Plaintiff's claim that she was terminated due to her religious beliefs is an adverse employment action. Therefore, Plaintiff meets the adverse employment action prong regarding this alleged incident of discrimination.

Regarding whether Plaintiff is qualified for her position, the Court already found, *supra*, that Plaintiff was qualified for her position.

As to the final prong of the prima facie case, Defendants assert that Plaintiff cannot show that was replaced by someone outside the protected class or treated less favorably than similarly-situated persons outside the class. Defendant contends that only one other employee was a member of the Church of Latter Day Saints. Defendants argue that even if the prayers and cruises were adverse employment actions, Plaintiff cannot show that these occurrences were directed solely at her because she was not a member of LDS. Defendant asserts that Plaintiff cannot demonstrate that she was treated less favorably than persons outside her class because:

(1) McPhee, who was not LDS, was terminated a few months after Plaintiff; (2) Zitterkopf, who replaced Plaintiff is not LDS; and (3) Plaintiff has no evidence that her lack of religious affiliation was a factor considered by the Defendants. Plaintiff responds that she was treated less favorably than Jones, who is not a member of the protected class and is similarly-situated to her.

As stated above, Plaintiff satisfies this prong of the prima facie case because Jones, who is not a member of the protected class, was not terminated for his poor performance, while Plaintiff was terminated because of her performance. Accordingly, the Court finds that Plaintiff satisfies the prima facie case on her claim that she was discharged on the basis that she did not share the same beliefs as Couch.

### c.        Pretext for Gender and Religious Discrimination

Once Plaintiff establishes a *prima facie* case, Defendant must come forward with a legitimate, non-discriminatory explanation for its adverse employment decision. *Burdine*, 450 U.S. at 254. Here, Defendants contend that Plaintiff was terminated because of her performance. Specifically, Defendants terminated Plaintiff because of her poor occupancy rates at Courthouse Square, among other properties.

In response to Defendants' legitimate, non-discriminatory reason for the decision, Plaintiff "must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." *Id*. at 256. A showing that the employer's proffered explanation is unworthy of credence can establish that the plaintiff was the victim of intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143 (2000). The prima facie case, and the inferences that can be drawn from the prima facie case, can be considered when looking at whether the defendant's explanation was pretextual. *Id*. "The

20

Supreme Court of Michigan and most federal courts of appeals follow the 'intermediate position'

for determining 'the proper summary judgment disposition standard for employment

discrimination claims under Michigan's Civil Rights Act.'" *Cicero v. Borg-Warner Auto., Inc.*,

280 F.3d 579, 589 (6th Cir. 2002) (quoting *Lytle*, 458 Mich. 153, 175 (1998)).

> Disproof of an employer's articulated reason for an adverse employment decision
> defeats summary disposition *only if* such disproof *also* raises a triable issue that
> discrimination animus *was a motivating factor* underlying the employer's adverse
> action.  In other words, plaintiff must not merely raise a triable issue that the
> employer's proffered reason was pretextual, but that it was a pretext for . . .
> discrimination.

*Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 438-39 (6th Cir. 2002) (citation omitted)

(emphasis added).  "A court may not consider the employer's alleged nondiscriminatory reason

for taking an adverse employment action when analyzing the prima facie case.  To do so would

bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the

nondiscriminatory reason was in actuality a pretext designed to mask discrimination."  *Wexler*,

317 F.3d at 574.

"To raise a genuine issue of fact as to pretext and defeat a summary judgment motion

under the intermediate position, the plaintiff must show one of the following:  (1) that the

proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the

action, or (3) that the proffered reason was insufficient to motivate the action." *Id*. (internal

citations omitted).

To show Defendants' proffered reason was pretext, Plaintiff argues that she was given

one reason for her termination: her Courthouse Square property had not performed.  Plaintiff

contends that this is an insufficient reason for her termination because she had never been

warned or disciplined for her alleged poor performance at this property and Courthouse Square

21

was a problem property through no fault of Plaintiff due to revocations, fires, unwanted tenants, and a poor reputation.  Plaintiff also asserts that Defendants' reason for her termination had no basis in fact because Couch played a role in terminating her, and thus she was terminated because she was not a member of LDS and because she was female.  Plaintiff supports her assertion that Couch played a role in her termination by stating that Weshinskey testified that he reacted to Couch's recommendations on issues such as pay raises; that Couch spoke to Weshinskey about the Regional Directors on a weekly to daily basis; and that Couch did not fire Plaintiff on January 9, 2004, when the decision was reached.

Defendants argue that failure to reach the percentage goals set by an employer and confrontation behavior are legitimate reasons for firing an employee.  Defendants aver that Plaintiff has failed to produce evidence that suggest that her low occupancy rates and her behavior at the meet were not the motivating factors.  Additionally, Defendants argue that they have not made inconsistent statements regarding Plaintiff's termination: the lag between Weshinskey's decision to fire Plaintiff was due to Couch's procrastination due to his distaste for terminating people and the desire to find a replacement before acting on the order to terminate.

The Court finds that Plaintiff has not meet her burden of showing pretext on either claim. Plaintiff must prove that the articulated reason was a mere pretext by a preponderance of the evidence.  The fact that Plaintiff casts doubt on Defendants' articulated reason is not enough to meet Plaintiff's burden of demonstrating discriminatory intent.  *Irvin v. Airco Carbide*, 837 F.2d 724 (6th Cir. 1984).  This Court cannot second-guess whether Defendants' decision was "wise, shrewd, prudent, or competent," but must "focus only on whether [Defendants'] decision was . . . not motivated by a discriminatory animus."  *Fashion Bug*,  473 Mich. at 871.

22

Plaintiff has failed to show that discriminatory animus was involved.  Plaintiff's occupancy rate at Courthouse Square was 80.2% on July 18, 2002, and 81.9% on January 3, 2004.  (Pl.'s Resp. Ex. 20, Daily Reports 1/18/02, 1/3/04).  While this Court understands the reasons Defendants gave for the low rate, it is not for the Court to decide whether it was a good business decision to fire Plaintiff.  Plaintiff's occupancy rate, for whatever reason, did not improve and Plaintiff has not shown that her gender or religion was a motivating factor in Defendants' decision to fire her.  This is especially significant considering that a female was hired to replace her who, it can only be assumed, is not a member of LDS, because, Plaintiff never makes that allegation.

Plaintiff's best argument for pretext on the gender discrimination claim is that she was informed it was her occupancy at Courthouse Square which lead to her termination, even though her Courthouse Square property tied for third most improved community occupancy in Michigan, in October 2003.  Plaintiff, however, does not proffer how many other properties Courthouse Square was ranked against, or what the ranking was based upon.  The Court is also uninformed as to whether occupancy was the only classification used in ranking the properties, what time frame the ranking was based upon, and whether the ranking was only as to Plaintiff's property portfolio.  Further, Defendants do not claim that Plaintiff was a substandard employee. In fact, Couch states that Plaintiff did some aspects of her job well.  (Pl.'s Resp. Ex. 4, Couch Dep. 57).  But Defendants have never strayed from their assertion that Plaintiff needed "to do all things well."  (*Id.*).  Defendants hired Plaintiff to improve occupancy in the Michigan portfolio and Plaintiff was not successful in that endeavor.  Plaintiff had to overcome serious obstacles with competition, fires and flooding.  Additionally, Plaintiff did improve the Courthouse Square

occupancy by 1.7% over her time with Defendants   However, Defendants were clear that they make their money on occupancy.  Plaintiff has not provided a preponderance of evidence, in a light most favorable to her, tying her gender or religious affiliation, as a motivating factor, to her dismissal.  Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's claims of gender and religious discrimination.

## 2.    Religious Retaliation

"To establish a prima facie case of retaliation, a plaintiff must show:  (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action."  *Garg v. Macomb County Cmty. Mental Health Servs.*, 472 Mich. 263, 273 (2005).

Defendants argue that although Plaintiff alleges that she complained to Couch several times regarding religious discriminatory treatment, she only provides specifics of two occasions. Defendants believe that an employee informing a supervisor that he or she was offended or uncomfortable with something does not equate with confronting and opposing discrimination. Defendants do not cite case law to support this position.  Defendants also assert that there is no evidence tying her opposition of discrimination to her termination.  Defendants point out that Plaintiff admits that she never complained to Weshinskey or Runquist, and produced no evidence that her complaints to Couch were ever brought to Weshinskey's attention.  Defendants also aver that Plaintiff complained sometime in Fall 2002 and April 2003, but was not terminated until February 18, 2004.  Further, Defendants claim that the two other people who joined Plaintiff in making the Johnny Lingo film complaint remained employed by Defendants after

24

Plaintiff's termination.

Plaintiff argues that her complaints to Couch about his requirement that employees pray before meals and on other occasions is protected conduct.

Complaints about discrimination are protected conduct. *See McLemore v. Detroit Receiving Hosp.,* 196 Mich. App. 391, 397 (1992); *EEOC v. Romeo Cmty. Schs.,* 976 F.2d 985, 989-90 (6th Cir. 1992). Viewing the facts in a light most favorable to Plaintiff, she engaged in protected conduct when she complained to Couch about the prayers.

The only other issue in dispute is whether there was a causal connection between Plaintiff's complaints to Couch and her termination. While Defendants argue that the ten months between her last complaint to Couch and her termination is not enough to create a nexus, Plaintiff argues that an adverse employment action for purpose of retaliation is any action which dissuades a reasonable worker from making or supporting charge of discrimination. With this argument, Plaintiff tries to bootstrap the alleged hostile environment created by Defendants into an adverse employment action. Plaintiff relies on *Burlington N. & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2415 (2006), to support her contention.

In *Burlington*, the Supreme Court there held that the anti-retaliation provision, 42 U.S.C. § 2000e-3(a), was not limited to discriminatory actions that affected the terms and conditions of employment required by 42 U.S.C. § 2000e-2(a). The Supreme Court's reasoning was that:

> The underscored words in the substantive provision–"hire," "discharge," "compensation, terms, conditions, or privileges of employment," "employment opportunities," and "status as an employee"--explicitly limit the scope of that provision to actions that affect employment or alter the conditions of the workplace. No such limiting words appear in the anti-retaliation provision.

*Id*. at 2411-12.

25

The case at bar involves the ELCRA, not 42 U.S.C. § 2000e-3(a) or 42 U.S.C. § 2000e-2(a), and therefore *Burlington* does not apply. Further, even if *Burlington* applied, the pertinent part of the ELCRA provides:

> (1) An employer shall not do any of the following: (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to *employment, compensation, or a term, condition, or privilege of employment* because of religion, race, color, national origin, age, sex, height, weight, or marital status.

M.C.L. § 37.2202(1)(a) (emphasis added). This ELCRA provision is similar to 42 U.S.C. § 2000e-2(a), which *Burlington* holds explicitly limits the scope to actions which affect employment or alter the conditions of the workplace.[6] Thus, an adverse employment action under the ELCRA is not so broad as to include any action which dissuades a reasonable worker from making or support a charge of discrimination. Therefore, Plaintiff is left with her termination as the only adverse employment action.

Plaintiff's termination did not occur until ten months after Plaintiff's second complaint to Couch. This, indeed, is too tenuous of a connection. *See Sobieski v. Takata Seat Belts, Inc.*, Case No. 268366, 2006 WL 2270382, *6 (Mich. App. Aug. 08, 2006) (stating that "the adverse employment action is tenuous because Sobieski complained . . . approximately seven months

---

[6]  42 U.S.C. § 2000e-2(a) reads:
(a) Employer practices. It shall be an unlawful employment practice for an employer--
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

before Sobieski's termination.").  The ten months between the complaint and Plaintiff's

termination is too remote to show causation.  Temporal proximity only establishes a causal

connection if "the evidence would enable a reasonable finder of fact to infer that an action had a

discriminatory or retaliatory basis."  *Rymal v. Baergen*, 262 Mich. App. 274, 303 (2004).  Here,

the proximity of the complaints to the termination, even in a light most favorable to Plaintiff,

does not enable a reasonable fact finder to infer the termination had a retaliatory basis due to

religion.

  Accordingly, the Court grants Defendants' Motion for Summary Judgment as to

Plaintiff's retaliation claim.

**III.  CONCLUSION**

  For the reasons stated, the Court GRANTS Defendants' Motion for Summary Judgment.

**SO ORDERED.**


           s/Paul D. Borman
           PAUL D. BORMAN
           UNITED STATES DISTRICT JUDGE

Dated:  February 15, 2007

        CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
February 15, 2007.


           s/Denise Goodine
           Case Manager